## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

SEAN L. SUAREZ, on behalf of himself
and all others similarly situated,

                 Plaintiff,

          Vs.

FIDELITY NATIONAL TITLE INSURANCE
COMPANY, CHICAGO TITLE INSURANCE
COMPANY, TICOR TITLE INSURANCE
COMPANY, FIDELITY NATIONAL FINANCE,
INC., FIRST AMERICAN TITLE INSURANCE
COMPANY OF NEW YORK, UNITED
GENERAL TITLE INSURANCE COMPANY,
FIRST AMERICAN CORPORATION,
COMMONWEALTH LAND TITLE INSURANCE
COMPANY, LAWYERS TITLE INSURANCE
CORPORATION, LANDAMERICA FINANCIAL
GROUP, INC., STEWART TITLE INSURANCE
COMPANY, MONROE TITLE INSURANCE
CORPORATION, STEWART INFORMATION
SERVICES CORPORATION, and TITLE
INSURANCE RATE SERVICE ASSOCIATION,
INC.,

                 Defendants

Civil Action No.

Class Action Complaint

Jury Trial Demanded



08 CV 1955

Plaintiff, Sean L. Suarez, by his attorneys, on behalf of himself and all others

similarly situated, brings this action for treble damages and injunctive relief under the

antitrust laws of the United States against the above named defendants, demands a trial

by jury, and complains and alleges as follows:

I.

## JURISDICTION AND VENUE

1.     This Complaint is filed and these proceedings are instituted under Sections 4 and 16 of the Act of Congress of October 15, 1914, C. 323, Stats. 731, 737 (15 U.S.C. §§15, 26) to obtain injunctive relief and to recover treble damages and the costs of suit, including a reasonable attorneys' fee, against defendants for the injuries sustained by plaintiff and the members of the class which he represents by reason of defendants' and their co-conspirators' violations, as hereinafter alleged, of Section I of the Sherman Act (15 U.S.C. §1).

2.     Defendants transact business, maintain offices or are found within the Southern District of New York.  The interstate commerce described hereinafter is carried on, in part, within the Southern District of New York and the conspiratorial acts herein alleged were carried on, in part, in the Southern District of New York.

II.

## PLAINTIFF

3.     Plaintiff, Sean L. Suarez, is an individual residing with the State of New York.  During the Class period, plaintiff purchased title insurance directly from one or more of the defendants herein and has been injured by reason of the antitrust violations alleged.

III.

## DEFENDANTS

4.     The Fidelity family of title insurance companies (collectively, "Fidelity") – which includes defendant Fidelity National Title Insurance Company ("Fidelity Title"),

defendant Chicago Title Insurance Company ("Chicago Title"), defendant Ticor Title Insurance Company ("Ticor Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. Fidelity accounts for roughly 31 percent of the title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $361 million. Nationally, Fidelity accounts for approximately 27 percent of title premiums, which in 2006 amounted to roughly $4.6 billion. Fidelity Title, Chicago Title and Ticor Title were founding members of Title Insurance Rate Service Association, Inc. ("TIRSA") and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

5.      Fidelity Title, Chicago Title, Ticor Title, and their affiliates are wholly-owned and controlled by defendant Fidelity National Finance, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida. Through its subsidiaries, Fidelity National is a provider of title insurance, specialty insurance, and claims management services. Fidelity National had 2006 revenues of roughly $9.4 billion. Fidelity engaged in the conduct challenged herein with the approval and assent of Fidelity National.

6.      The First American family of title insurance companies (collectively, "First American") – which includes defendant First American Title Insurance Company of New York ("First American Title"), defendant United General Title Insurance Company ("United General Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. First American accounts for roughly 25 percent of the title

3

insurance premiums consumers pay in New York, which in 2006 amounted to roughly $290 million. Nationally, First American accounts for approximately 29 percent of title premiums, which in 2006 amounted to roughly $4.8 billion. First American Title and United General Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

7.     First American Title, United General Title, and their affiliates are wholly-owned and controlled by defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California. Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services. FAC had 2006 revenues of roughly $8.5 billion. First American engaged in the conduct challenged herein with the approval and assent of FAC.

8.     The LandAmerica family of title insurance companies (collectively, "LandAmerica") – which includes defendant Commonwealth Land Title Insurance Company ("Commonwealth"), defendant Lawyers Title Insurance Corporation ("Lawyers Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. LandAmerica accounts for roughly 22 percent of title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $258 million. Nationally, LandAmerica accounts for approximately 19 percent of title premiums, which in 2006 amounted to roughly $3.15 billion. Commonwealth and Lawyers Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

9.     Commonwealth and Lawyers Title are wholly-owed and controlled by defendant Land America Financial Group, Inc. ("LAFG"), a Virginia corporation headquartered in Glen Allen, Virginia. Through its subsidiaries, LAFG is a provider of title insurance and other products and services that facilitate the purchase, sale, transfer, and financing of residential and commercial real estate. LAFG had 2006 revenues of roughly $4 billion. LandAmerica engaged in the conduct challenged herein with the approval of LAFG.

10.     The Stewart family of title insurance companies (collectively, "Stewart") – which includes defendant Stewart Title Insurance Company ("Stewart Title"), defendant Monroe Title Insurance Corporation ("Monroe Title"), and their affiliates – is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. Stewart accounts for roughly 14 percent of the title insurance premiums consumers pay in New York, which in 2006 amounted to roughly $168 million. Nationally, Stewart accounts for approximately 12 percent of title premiums, which in 2006 amounted to roughly $2 billion. Stewart Title and Monroe Title were founding members of TIRSA and since TIRSA's inception have charged title insurance rates in New York that TIRSA collectively sets.

11.     Stewart Title and Monroe Title are wholly-owned and controlled by defendant Stewart Information Services Corporation ("SISC"), a Delaware corporation headquartered in Houston, Texas. Through its subsidiaries, SISC is a provider of title insurance and related information and post-closing lender services. SISC had 2006 revenues of roughly $2.5 billion. Stewart engaged in the conduct challenged herein with the approval and assent of SISC.

12.     Together, Fidelity, First American, Commonwealth and Stewart account for more than 90 percent of the title premiums consumers pay in New York, which in 2006 amounted to roughly $1.1 billion. Nationally, they account for more than 85 percent of title premiums, which in 2006 amounted to roughly $14.5 billion. Throughout the relevant damages period, defendants charged New York consumers identical title insurance rates that were collectively set through TIRSA.

13.     Defendant TIRSA is a voluntary association of title insurers licensed as a rate service organization pursuant to Article 23 of the Insurance Law. TIRSA maintains its offices in New York City, which until recently were located at the same New York address as Defendant Fidelity Title.

14.     TIRSA annually compiles from its members statistical data relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the Insurance Department. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members. The Insurance Department has never objected to any of the rates TIRSA has collectively set.

15.     TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. Currently, Fidelity, First American, LandAmerica, and Stewart collectively represent 14 of TIRSA's 22 members. As such, they comprise a majority voting block which, according to TIRSA's by-laws, allows them to control the operations of TIRSA and, in particular, TIRSA's collective rate setting activity.

IV.

## CO-CONSPIRATORS

16.     Various other person, firms and corporations not made defendants herein have participated as co-conspirators with the defendants in the violations alleged herein and have performed acts and made statements in furtherance thereof.

V.

## DEFINITIONS

17.     As used herein, the term "Class period" shall mean the time period from February 12, 2004 through the date of the filing of this suit.

VI.

## CLASS ACTION ALLEGATIONS

18.     Plaintiff brings this action under Rule 23, and particularly subsection (b) (3), of the Federal Rules of Civil Procedure, on behalf of himself and a Class consisting of all persons excluding governmental entities, defendants, subsidiaries and affiliates of defendants, who purchased directly, from one or more of the defendants and/or their co-conspirators title insurance for residential and commercial property in New York State during the period in suit and who have sustained damages as a result of the conspiracy herein alleged. The number of potential Class members is so numerous that joinder is impracticable.

19.     Plaintiff, as representative of the Class, will fairly and adequately protect the interest of the Class members. The interests of plaintiff are coincident with, and not antagonistic to, those of the Class members.

20.    Except as to the amount of damages each member of the Class has by itself sustained, all other questions of fact and law are common to the Class, including but not limited to, the combination and conspiracy hereinafter alleged, the violation of Section 1 of the Sherman Act (15 U.S.C. §1) and the effects of such violation.

21.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members of the Class, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy in that, among other things, there is no interest by members of the Class in individually controlling the prosecution of separate actions, and it is desirable to concentrate the litigation of the claims made herein in a single proceeding in order to provide small claimants with a forum in which to seek redress for this antitrust violation. Whatever difficulties may exist in the management of the class action will be greatly outweighed by the class action procedure, including but not limited to providing claimants with a method for the redress of claims which may not otherwise warrant individual litigation.

VII.

TRADE AND COMMERCE

22.    During all or part of the period in suit, defendants and their co-conspirators were sellers of title insurance in New York State.

23.    During the period in suit, the defendants sold substantial quantities of title insurance in a continuous and uninterrupted flow in interstate commerce.

24.     During the period in suit, Class members from locations outside New York State purchased commercial or residential property and title insurance within New York State.

25.     During the Class period in suit, the defendants were the major sellers of title insurance in the United States and New York State.  Defendants controlled in excess of 90 percent of the market for title insurance in the United States and New York State. Total sales of title insurance by defendants exceeded $1.2 billion on an annual basis in New York State throughout the period in suit.

26.     The activities of the defendants and their co-conspirators, as described herein, were within the flow of interstate commerce and substantially affected interstate commerce.

VIII.

VIOLATIONS ALLEGED

27.     Beginning at least as early as February 12, 2004, and continuing thereafter to the present, the exact dates being unknown to plaintiff, defendants and their co-conspirators engaged in a combination and conspiracy in unreasonable restraint of the aforesaid interstate trade and commerce in violation of Section 1 of the Sherman Act.

28.     The aforesaid combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been:

        (a)     to fix, raise, maintain and stabilize the price of title insurance throughout New York State; and,

(b)    to fix, raise, maintain and stabilize the terms and conditions of sale of title insurance in New York State.

29.    Title insurance is one of most costly items associated with the closing of a real estate transaction. In New York, TIRSA's collectively fixed rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranges from about $1,200 (for a $250,000.00) property to $3,700 (for a $1 million property). For more expensive homes and commercial properties, these prices are significantly higher and can reach the tens of thousands of dollars. In 2006 alone, New York consumers paid roughly $1.2 billion for title insurance, most of which went to defendants and their affiliates. This amount has risen dramatically over the past decade, more than quadrupling the roughly $260 million in insurance premiums that New York consumers paid in 1996.

30.    Title insurance serves an important purpose. It protects the purchaser of a property from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property with the ultimate right to resell the property. In New York, title insurance is required by lenders in most residential and commercial real estate transactions.

31.    Consumers exercise little discretion in choosing the title insurer from which they purchase the insurance. That decision is typically made for them by their lawyer, mortgage broker, lender, or realtor. Consequently, for most purchasers, the cost of title insurance is largely overlooked and seldom, if ever, challenged. Most consumers do not even become aware of the price they will pay and to which insurer they will pay it

until the actual closing of the real estate transaction. There is no shopping around. There is no negotiation of price.

32.   This dynamic basically removes the sale of title insurance from the normal competitive process. Unlike the regular forces of supply and demand that keep most industries and their pricing in check, the title insurance industry is not subject to any real competitive constraints. The purchasers of the insurance, in most instances, are not the ones making the purchasing decisions. And, they are certainly in no position to question the price.

33. ·   The most effective way for a particular title insurer to get business is to encourage those making the purchasing decisions – the lawyers, brokers, lenders – to steer business to that insurer. The best way to so motivate these third-party representatives is not through lower prices (that they are not even paying). Rather, it is through kickbacks in the form of finder's fees, gifts, and other financial enticements. Therefore, it is higher pricing (which allows for this third-party consideration), not lower pricing, that provides the best way for title insurers to compete and increase their business.

34.   New York is only one of a very small number of states in which the leading title insurers collectively fix their prices through a rate-setting organization like TIRSA. There are two principal cost components that go into TIRSA's calculation. One comprises the risk associated with issuing the title policy. The other comprises the "agency commissions" paid to title agents.

35.   The risk component covers the risk the title insurer bears for any undiscovered defects in the title. Unlike property insurance, title insurance carries with it

a very limited risk of loss to the insurer. That is because title insurance protects against *prior* events that cause defects in title. With a proper search and examination of prior ownership records, any such defects can and almost always are readily identified and excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policy amounts to only about 5 percent of the total premium collected. It is even lower in New York. This is very different from property coverage (such as auto and home insurance) – which protects against *future* occurrences over which the insurer has little to no control – where the average claim payout amounts to about 80 percent of the total premium.

36.     The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management stake in may of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically outsource this task to title agents.

37.     The remainder, and by far the bulk, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other financial inducements title insurers provide to title agents and indirectly (through title agents) to the lawyers, brokers, and lenders who, in reality, are the ones deciding which title insurer to use. These payments have nothing to do with the issuance of title insurance and are made by title insurers merely to inflate their revenues and steer business their way.

38.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the so-called "costs" associated with the payment of agency commissions. Only 15 percent is based on costs associated with the risk of loss.

39.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so despite the fact that the costs associated with agency commissions are entirely unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with producing a particular title policy and provide no value – proportional to property value or otherwise – to the consumer. Even search and exam costs are unrelated to property value. They instead depend on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

40.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission("FTC") challenge to the collective rate setting activity of many of these associations. The FTC's challenge culminated in *FTC v. Ticor Title Ins. Co.,* 504 U.S. 621 (1992), where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

41.    In *Ticor*, like here, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or

analysis of their reasonableness or cost justification. The Supreme Court agreed with the

FTC that this kind of limited state oversight was not sufficient. Rather, to avoid illegal

price-fixing liability, the state insurance department has to "exercise[]sufficient

independent judgment and control so that the details of the rates or prices have been

established as a product of deliberate state intervention, not simply by agreement among

private parties." *Ticor*, 504 U.S. at 634-35.

42.    Following the Supreme Court's instruction in *Ticor*, the Third Circuit on

remand in *Ticor Title Ins. Co. v. FTC*, 998 F.2d 1129 (3d Cir. 1992), upheld the FTC's

finding that the collective rate-setting of certain state rating bureaus was improper

because it was not actively supervised by the state. According to the Circuit court, "[t]he

Supreme Court plainly instructed us that a state's rubber stamp is not enough. Active

supervision requires the state regulatory authorities' independent review and approval."

*Id.* at 1139.

43.    Defendants formulated TIRSA's first rate manual and procedure soon

after the Supreme Court's *Ticor* decision. Through TIRSA, defendants have set up a

rate-setting scheme to get around the rigors of state oversight required by *Ticor*. They

have done so by calculating a single rate that comprises both risk and agency commission

costs and by outsourcing to title agents the agency commission costs. In this way,

defendants avoid providing the Insurance Department with any detailed breakout or

backup for the bulk of the costs that make up their collectively fixed rates.

44.    TIRSA merely submits an aggregated figure that is supposed to represent

the total agency commission costs. Embedded within this figure is the vast quantity of

dollars that are funneled to and through the title agencies as kickbacks, financial

inducements and other costs unrelated to the issuance of title insurance. Defendants' design in all of this has been to effectively "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

45.    There is no provision under the Insurance Law for TIRSA to include in its collectively fixed rates kickbacks and other agency commission payments unrelated to the issuance of title insurance. Indeed, the Insurance Department has openly acknowledged that it lacks the authority to review any agency commission payments. It has likewise recognized that defendants' outsourcing of agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates. This was made clear at a November 2006 public hearing the Insurance Department held – the first in 15 years – where it questioned TIRSA and its members on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

46.    At the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

47.    The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations,* needed to analyze premium prices and underlying costs." (emphasis added)

48.    The Insurance Department has recently tried to take its first steps in the direction of more active oversight by proposing legislation that would impose a licensing requirement on title agents. This legislation is currently pending before the New York legislature. If enacted, it would bring title agents under the regulatory authority of the Insurance Department for the first time. This would seemingly provide some assistance in filing the regulatory vacuum that currently exists with regard to title agency costs.

49.    However, even if the legislature expands the Insurance Department's authority in this way, this alone will not be enough to solve the problem. As the GAO report found, there are significant regulatory lapses even in those states that have licensing requirements for title agents:

> only two of the six regulators we reviewed collected financial and operational data on title agents, and regulatory officials in both those states said that the data that they currently collect was insufficient to analyze the appropriateness of [title] rates.

50.    In any event, the Insurance Department's call for legislative assistance in regulating title agents and reviewing their agency commissions further highlights the fact that it currently has neither the authority nor the ability to properly assess defendants' collectively fixed rates.

51.    Unchecked by regulatory review and insulated from competition, defendants have thus been able to collectively fix title insurance rates at supracompetitive levels and earn profits that vastly exceed those contemplated by the Insurance Department or that would have resulted in a free and open competitive market.

52.    At the time of TIRSA's formation, the Insurance Department established 5 percent (of the total premium) as the level of profit to which title insurers are entitled.

The Insurance Department is supposed to carefully analyze TIRSA's rate calculations, and, in particular, its revenue and cost information, to ensure that this 5 percent profit level is maintained and based on a reasonable premium. However, without the authority or ability to scrutinize agency commission costs, the Insurance Department has been unable to perform this function. As a result, defendants (through TIRSA) have been able to set artificially high title premiums and secure title profits far in excess of the 5 percent threshold.

53.      Through an independent investigation it conducted over the past several years, the New York State Attorney General confirmed defendants' excess profits in this regard. It found that for every dollar of insurance premium defendants collected, of the roughly 15 cents that supposedly accounts for the risk of loss, only 3 cents is paid out in claims. And, of the roughly 85 cents that supposedly covers agency commissions, only between 8 and 11 cents goes to costs actually incurred by title agents in producing the title policy. These numbers show that TIRSA's collectively fixed rates have resulted in profits that vastly exceed the 5 percent profit level the Insurance Department prescribed.

54.      The Attorney General's investigation further revealed that what was largely driving these numbers were the kickbacks and other financial inducements defendants were funneling to and through title agents to secure more business. As reported at the Insurance Department's 2006 hearing, one title agency's financial statements revealed that it spent more than $1 million of these so-called "agency commissions" on items identified as "Christmas", 'automobile expenses", "political contributions", "promotional expenses", and "travel and entertainment". These expenses are not even remotely related to the issuance of title insurance.

55.    All of this "excess money" paid to title agents not only works to steer business to defendants. It also serves to boost defendants' own profits through the inflated revenues they obtain to cover these agency payments and through their ownership or management stake in many of these agencies.

56.    Defendants are competitors in the sale of title insurance to consumers in New York. Through TIRSA, these title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance in New York, (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the Insurance Department has no ability or authority to regulate.

57.    In the absence of proper regulatory authority and oversight, defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance in New York and is a *per se* violation of Section I of the Sherman Act.

58.    Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through TIRSA's submissions to the Insurance Department of supposed cost and revenue information and its periodic submissions of rate changes.

59.    Through their collective price-fixing and manipulation of the regulatory process, defendants have harmed competition by charging consumers supracompetitive prices for title insurance in New York.

60.    New York's title insurance rates are among the highest in the country. According to rate comparisons made by Bankrate.com, one of the country's leading aggregators of financial rate information, New York title rates (based on insuring a property with a $200,000 mortgage) are roughly 67 percent higher than the national average. The gap is even greater with many of New York's Northeast neighbors including Massachusetts (70%), Maryland (76%), Vermont (81%), Delaware (83%), Maine (85%), Washington, D.C. (87%), and New Hampshire (111%).

## IX.

## EFFECTS

61.    The aforesaid combination and conspiracy has had the following effects among others:

(a)    price competition in the sale of title insurance has been suppressed, restrained and eliminated;

(b)    prices for title insurance have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels; and,

(c)    purchasers of title insurance have been deprived of the benefit of free and open competition.

## X.

## DAMAGES

62.    During the period of the antitrust violations by defendants and their co-conspirators, plaintiff and each member of the Class he represents, has purchased title insurance and, by reason of the antitrust violations herein alleged, paid more for such insurance than would have been paid in the absence of said antitrust violations. As a

result, plaintiff and each member of the Class he represents, has been injured and damaged in an amount presently undetermined.

XI.

PRAYER FOR RELIEF

WHEREFORE, plaintiff demands:

(a)    That the alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

(b)    That judgment be entered against defendants, jointly and severally, and in favor of plaintiff, and each member of the Class it represents, for threefold the damages determined to have been sustained by plaintiff, and each member of the Class it represents, together with the cost of suit, including a reasonable attorneys' fee;

(c)    Each of the defendants, successors, assignees, subsidiaries and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf thereof or in concert therewith, be perpetually enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the aforesaid combination, conspiracy, agreement, understanding or concert of action, adopting or following any practice, plan, program, or design having a similar purpose or effect in restraining competition; and,

(d)    Such other and further relief as may appear necessary and appropriate.

## JURY TRIAL DEMANDED

Pursuant to Rule 38, F.R.C.P., plaintiff demands a trial by jury of the claims

alleged herein.

Dated: February 27, 2008
New York, New York

Robert A. Skirnick (RS 2636)
Maria A. Skirnick
MEREDITH COHEN GREENFOGEL
    & SKIRNICK, P.C.
One Liberty Plaza, 35th Floor
New York, N.Y.  10006

Joel C. Meredith
Steven J. Greenfogel
Daniel B. Allanoff
MEREDITH COHEN GREENFOGEL
    & SKIRNICK, P.C.
1521 Locust Street, 8th Floor
Philadelphia, PA.  19102

Steve W. Berman
Anthony D. Shapiro
HAGENS BERMAN SOBOL
    SHAPIRO, LLP
1301 Fifth Avenue, Suite 2900
Seattle, WA.  98101

Joseph DePalma, Esquire
LITE DE PALMA GREENBERG &
    RIVAS, LLC
12th Floor
Two Gateway Center
Newark, NJ   07102-5003